# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | : |
| | : |
| INNOVATIVE SPINAL | : |
| TECHNOLOGIES, INC., | : |
| | : |
| Debtor. | : |
| | : |

Chapter 7

Case No. 09-14415 (FJB)

# SEALED ALL ASSET AUCTION BID FORM

The United States Bankruptcy Court for the District of Massachusetts ("Bankruptcy Court") authorized Warren E. Agin, the chapter 7 trustee of the above Debtor, to conduct an auction for the sale of the Debtor's assets pursuant to that certain Order dated August 3, 2009 ("Bid Procedures Order"). Each capitalized term used but not otherwise defined herein shall have the meaning set forth in the Bid Procedures Order.

1. The Starting Bid for the All Asset Auction is the offer made by Biomet, Inc. ("Biomet"), or its designee, in that certain letter (and attachments) to the Trustee dated August 14, 2009 submitted in accordance with the Bid Procedures Order. That offer included, among other items, Cash Consideration of $5,500,000.

2. The Bid Procedures Order requires that if Biomet elects to submit a sealed bid at the auction, that the amount shall be at least $350,000 higher than the Starting Bid (thus, at least **$5,850,000**).

3. The Bid Procedures order requires that if Integra LifeSciences Corporation ("Integra") elects to submit a sealed bid at the auction, that the amount shall be at least **$5,575,000** (which amount takes into account the Auction Threshold set forth in the Bid Procedures Order).

4. In accordance with the Bid Procedures Order, **Integra LifeSciences Corporation, subject to the terms and conditions of the Asset Purchase Agreement between the Trustee and Integra LifeSciences Corporation (as modified herein),** hereby submits the offer set forth herein. Among other items, this offer includes the following items:

    a. Cash Consideration:      **$9,250,001.53**

    b. Assumed Liabilities:      **None, other than as set forth below with respect to Jackson License.**

    c. Assumed Contracts consist of those contracts listed at the attached **Exhibit A**.

1

d. Excluded Assets, if any, in addition to those identified in **Schedule 1.8** of the original Asset Purchase Agreement

**None other than with respect to contracts not assumed and assigned to Integra pursuant to 11 U.S.C. §365**

e. Proposed Treatment of Objectors:

    i)    X-Spine — **Contract Not Assumed and Assigned to Integra**

    ii)    Jackson — **Contract Assumed and Assigned to Integra pursuant to 11 U.S.C. §365. Integra shall pay Cure Costs, as necessary, up to $30,000, in addition to Cash Consideration, allocated as $10,000 for royalties due per quarter for 2009 Q1, Q2 and Q3.**

    iii)    Millstone — **Contract Not Assumed and Assigned to Integra. But Integra shall recover possession of the Inventory at its cost, thereby relieving estate of cost to recover and deliver possession of Inventory to Integra. Integra shall waive the condition in the APA requiring the Trustee to deliver possession of the Inventory at Closing, and Integra shall take the Inventory "where is, as is."**

*(Remainder of page intentionally blank)*

2

iv)   Boehm-Melnick   **Contract Not Assumed and Assigned to Integra (but so-called "Boehm/Melnick Patent" previously assigned to IST shall be conveyed to Integra pursuant to APA)**

5.  This offer is submitted in compliance with the Bid Procedures Order.


**INTEGRA LIFESCIENCES CORPORATION**


By: _____
Name:   John B. Henneman, III
Its:      Executive Vice President and Chief Financial Officer
            Hereunto duly authorized

3

## Exhibit A

### Assumed Contracts

1.     Patent License Agreement with Alpinespine, L.L.C. dated August 7, 2006 (No cure costs owed)

2.     Development and License Agreement with Roger P. Jackson, M.D., Midwest Spine Foundation and SMS Trust (collectively, the "Jackson Group") dated November 1, 2004 (Cure Costs to be paid by Integra as set forth in to section 4. e. ii. Above)

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("Agreement") dated as of the 27th day of July 2009, is by and between Warren E. Agin, Chapter 7 Trustee ("Trustee" or "Seller") of Innovative Spinal Technologies, Inc., a Delaware corporation ("Debtor"), pursuant to Debtor's bankruptcy case under Chapter 7 of Title 11 of the United States Bankruptcy Code ("Bankruptcy Case"), and Integra LifeSciences Corporation ("Buyer").

**WITNESSETH:**

**WHEREAS,** on May 15, 2009 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court");

**WHEREAS,** before the Petition Date, Debtor was engaged in business as a spine technology company, headquartered in Mansfield, Massachusetts, which developed motion preservation and minimally invasive treatments for spinal disorders; and

**WHEREAS,** Seller desires to sell Seller's Assets (as hereinafter defined), and Buyer desires to purchase such Assets pursuant to the terms and conditions of this Agreement and pursuant to an order of the Bankruptcy Court approving such sale ("Sale Order"), under Bankruptcy Code Section 363, such Sale Order to include the assumption and assignment of certain executory contracts as provided herein pursuant to Bankruptcy Code Section 365;

**NOW THEREFORE,** in consideration of the promises, covenants and other consideration described herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows, intending to be legally bound:

## ARTICLE 1
## TRANSFER OF ASSETS AND PURCHASE PRICE

1.1    Assets. Pursuant to the Sale Order of the Bankruptcy Court approving the same and subject to the terms and conditions of this Agreement, Seller agrees to sell, convey, transfer and deliver to Buyer (or one or more of its designee(s)) at Closing (as hereinafter defined) all Seller's right, title and interest in and to all of Debtor's assets, including, without limitation, those set forth on Schedule 1.1 (collectively, the "Assets"), free from all claims, defaults, liens, taxes, debts, interests and encumbrances of any kind, except the Assumed Liabilities (as hereinafter defined), but excluding those certain assets specifically excluded in Schedule 1.8 (the "Excluded Assets"). Without limiting the generality of the immediately preceding sentence, the Assets include, but are not limited to:

(a)    All Assets in connection with Debtor's "Paramount MIS" and "Paramount Open" lines of business (such Debtor's "Paramount MIS" and "Paramount Open" lines of business shall be referred to as the "Business;" all lines of business other than the Business shall be referred to as the "Other Business;" and the Business and the Other Business will be referred to as the "Combined Business");

(b)    All inventories, wherever located (including raw materials, work-in-process, finished goods and other inventory items), used or useful in, manufactured at or otherwise relating to the Combined Business, or any part thereof (collectively, "Inventory"), including, without limitation, (i) all such Inventory located or stored at Debtor's former operating facilities, and (ii) all such finished goods Inventory (wherever located) manufactured in the Combined Business or any part thereof, and held for sale on behalf of Seller by third parties, on consignment or otherwise;

(c)    All machinery, equipment, fixtures and other tangible assets relating to or used by Debtor in connection with the Combined Business, or any part thereof;

(d)    All information technology systems implemented or used in the Combined Business, or any part thereof, including, without limitation, all equipment and software relating thereto but only to the extent any corresponding license for such information technology is assumable and assignable pursuant to Bankruptcy Code Section 365;

(e)    all regulatory filings, clearances, approvals and permissions and documents including device design documents, quality documents, submissions and correspondence with the United States Food and Drug Administration and any and all other federal, state, foreign or international regulatory bodies in any way related to or used in the Combined Business, or any part thereof;

(f)    (Intentionally deleted);

(g)    All equipment leases, contract rights and other rights with respect to machinery and equipment owned by parties other than Debtor's bankruptcy estate ("Estate"), as well as such other contracts and agreements relating to the Combined Business (or any part thereof) as Buyer may, in its sole discretion, elect to acquire and assume prior to the Closing date;

(h)    All claims, causes of action, demands and all rights with respect to any of them, (excluding causes of action arising pursuant to the so-called "avoidance powers" provisions of the Bankruptcy Code, under 11 U.S.C. §§541 – 553 or any causes of action of a derivative nature that could be asserted by the Trustee) arising from or related to the Combined Business or any part thereof;

(i)    All intellectual property of any kind and character (other than as disclosed on Schedule 1.8), including, without limitation, any and all patents, patent applications, trade secrets, technology, know-how, inventions, processes, technical information and data, tools and dies, designs, plans, drawings, diagrams, schematics and other proprietary information and intellectual property relating to or used in connection with the Combined Business or any part thereof, wherever located, including, without limitation, (i) all of the foregoing which relate to the Combined Business, (ii) that certain patent and patent application formerly owned by Frank H. Boehm, Jr. and Benedetta D. Melnick and assigned by them to Debtor, which was filed on December 17, 2002 and which bears application serial number 10/320,989, which is now issued as U.S. Patent No. 7,306,603, together with all its continuations, continuations-in-part, divisionals, substitutes, related provisionals and related non-provisional applications, including any and all foreign counterparts to all of the foregoing and any and all extensions thereof, and

including any and all reissues and reexaminations of all of the foregoing; ("Boehm/Melnick Patent"), which shall be transferred to Buyer by Seller free and clear of, inter alia, any and all claims of ownership to such patent, or rights to acquire ownership of such patent, by Frank Boehm, Jr., Benedetta Melnick, Creative NeuroScience Applications LLC , including as asserted by any of them in civil action number 6:09-cv-00131-DNH-GHL, Boehm, et. al v. Innovative Spinal Technologies Corporation, et. al, in the United States District Court for the Northern District of New York ("Boehm/Melnick Litigation"), the Bankruptcy Case or otherwise, (iii) all of the Estate's right, title, and interest in and to the technology, patented or otherwise, described in that certain "Development and License Agreement (Polyaxial Screw)" dated effective November 1, 2004, and as amended June 1, 2005, between and among Roger P. Jackson, M.D., Midwest Spine Foundation, SMS Trust under Trust Agreement dated August 11, 1995 and Debtor (the "Jackson Agreement"), and (iv) any and all other intellectual property, or interest in intellectual property, that is property of the Estate and/or that was property of IST (it being understood and agreed that Buyer's ownership of all of the foregoing shall be exclusive and that Seller is not retaining any rights therein and shall not sell or provide any of the foregoing to any purchaser of any other assets or business of Seller or use any of the foregoing for any purpose following the Closing date);

(j)    All trademarks, trade-names, customer lists and data, marketing plans and documents, advertising, sales and promotional materials, marketing studies and reports and other documents and materials developed or used in connection with or otherwise relating to the Combined Business, or any part thereof, including all of Seller's right, title and interest in and to the terms "Paramount" and any phrase or phrases including the term "Paramount", and including all of the goodwill in the business and products associated with the Business and with the Combined Business; and

(k)    All books, records, ledgers, operating data, documents, correspondence and other data, information, intangible properties, rights and assets relating to the Combined Business or any part thereof.

1.2    Consideration. Buyer shall pay to Seller the following consideration for the Assets (the "Purchase Price"):

(a)    Five Million Dollars ($5,000,000) (the "Cash Consideration"). The Cash Consideration shall be paid as follows:

(i)    Upon the mutual execution of this Agreement by the parties, Buyer shall provide a deposit of Two Hundred and Fifty Thousand ($250,000.00) ("Deposit"), to be held by Seller in Seller's segregated clients funds or similar escrow account pending the Closing, and applied to the Purchase Price upon Closing. Failure by Buyer to close in accordance with the terms and conditions of this Agreement, solely as a result of Buyer's breach of such terms and conditions, will result in Buyer forfeiting the Deposit in full satisfaction of any claims Seller may have against Buyer resulting from Buyer's breach, provided however that in no event shall Buyer have any limitation of liability by virtue of this Agreement for any violation of Bankruptcy Code Section 363(n).

(ii)    The balance of the Cash Consideration shall be paid at Closing.

and

(b)    Buyer's assumption of the Assumed Liabilities pursuant to <u>Section 1.6</u> of this Agreement.

1.3    <u>Allocation of Proceeds.</u> The parties agree that prior to the Closing Date, they or their representatives shall in good faith allocate the Purchase Price among the Assets.

1.4    <u>Delivery of Cash Consideration.</u> At Closing, Buyer shall pay to Seller the balance of the Cash Consideration in immediately available funds by wire transfer or certified or cashier's check, as specified by Seller in written instruction delivered to Buyer.

1.5    <u>Assignment of Contracts, Leases and Other Assets.</u>   Subject to the terms and conditions of this Agreement, as of Closing, Seller shall assign and transfer to Buyer pursuant to 11 U.S.C. §365 all Seller's right, title and interest in and to Debtor's contracts identified by Buyer prior to Closing (as defined below) (the "<u>Assigned Contracts</u>").

1.6    <u>Assumption of Liabilities.</u> As partial consideration for the Assets, Buyer shall assume, perform and discharge, by Bankruptcy Court order, pursuant to Bankruptcy Code Section 365, from and after Closing, the following Seller obligations (the "<u>Assumed Liabilities</u>"):

(a)    All Seller's liabilities under the Assigned Contracts; and

(b)    All Seller's obligations under any Assigned Contract.

1.7    <u>Excluded Liabilities.</u> Except for the Assumed Liabilities, Buyer shall assume no other debts, liabilities, or obligations of Seller.

1.8    <u>Excluded Assets.</u> The Assets to be conveyed by Seller to Buyer hereunder shall not include any asset, tangible or intangible, set forth as Excluded Assets on <u>Schedule 1.8</u>. Buyer shall have the right to amend <u>Schedule 1.8</u> by adding items selected by Buyer in its sole discretion to the Excluded Assets, but Buyer shall not be entitled to a reduction in the Cash Consideration as a result of any additions Buyer elects to make to <u>Schedule 1.8</u>.

## ARTICLE 2
## CLOSING

2.1    <u>Closing.</u> The transfers and deliveries referred to in <u>Article 1</u> hereof (the "<u>Closing</u>") shall take place at the office of Eckert Seamans Cherin & Mellott, LLC located at Two International Place, 16th Floor, Boston, Massachusetts 02110, or by such other means, including facsimile, and at such other time and date as the parties may agree or such exchange actually occurs (the "<u>Closing Date</u>"). Notwithstanding anything in this Agreement to the contrary, if Closing is consummated, Closing's effective time shall be 12:01 a.m. on the Closing Date.   Absent

agreement by the parties otherwise, the Closing shall occur no later than the 11th business day after Sale Order (as defined below) becomes a "Final Order" (as defined below).

2.2    Conditions to Closing.

(a)    The obligations of Buyer and Seller under this Agreement are subject to the satisfaction or waiver by Buyer or Seller, as applicable, of the following conditions precedent on or before Closing:

(i)    Seller shall have filed a motion or motions for approval ("Approval Motion") under Bankruptcy Code Sections 363 and 365 of (1) the sale of Assets, the assumption and assignment of Assigned Contracts, and the assumption of Assumed Liabilities pursuant to this Agreement's terms and the transactions hereunder (the "Transaction"); (2) the sale of Assets to Buyer free and clear of liens, claims and interests, to the fullest extent possible under Bankruptcy Code Section 363(f); and (3) the form of this Agreement;

(ii)    The Bankruptcy Court shall have entered the Sale Order, which Sale Order shall be in form and substance reasonably satisfactory to Buyer and its counsel, and shall, among other things, include a finding that Buyer has purchased the Assets in "good faith" within the meaning of Bankruptcy Code Section 363(m), and shall include provisions, without limitation,

(a)    authorizing, empowering and directing Seller to perform all acts, execute and deliver all documents, that are reasonably necessary, proper or desirable as requested by Buyer to implement and consummate the purchase and sale contemplated by this Agreement, all without further order of the Bankruptcy Court or notice to any entities;

(b)    determining that upon consummation of the purchase and sale contemplated by this offer Buyer shall have good and marketable title to all of the Assets free and clear of any and all claims, interests, liens and encumbrances including, without limitation, with respect to the Boehm/Melnick Patent, Buyer shall own the Boehm/Melnick Patent, and can practice the patented technology described in the Boehm/Melnick Patent, free and clear of any and all competing claims, interests, liens and encumbrances of any and all entities, including claims to ownership or rights to ownership (on theories of rescission or otherwise) of the Boehm/Melnick Patent asserted or claimed by the plaintiffs in the Boehm/Melnick Litigation, whether asserted or claimed in the Boehm/Melnick Litigation, the Bankruptcy Case or otherwise;

(c)    determining that Seller is authorized and empowered to execute and deliver documents on the Estate's behalf, and to perform acts on the Estate's behalf to consummate and perform Seller's obligations to sell the Assets to Buyer, all without further order of the Court or notice to any entity whatsoever;

(d)    providing Buyer with rights of access to the books, records, premises and property of the Estate, including without limitation the Assets, upon notice with any expense to be borne by Buyer at any reasonable time prior to the Closing, for inspection and testing to ensure compliance with the conditions of Closing;

(e)     providing that Buyer shall not be deemed a successor and shall under no circumstances incur or be liable for any debts or liabilities of Seller or Debtor or claims in the Bankruptcy Case, under any theory of successor liability or otherwise, and

(f)     providing that from and after Closing, Buyer's rights to practice all of Debtor's intellectual property, including, without limitation, pursuant to licenses assigned to Buyer as part of the transaction contemplated hereunder, are free from interference of any kind by any entity;

(g)     providing a mechanism, satisfactory to Buyer and Seller, pursuant to which any Inventory held by a third party shall be obtained by Buyer; and

(h)     containing such other terms and conditions as may reasonably be requested by Buyer.

(iii)     The Sale Order shall be a "Final Order". The Sale Order shall be a Final Order at the later of the time when (i) the period for commencement of all appeals of the Sale Order shall have passed, with no appeal having been filed, or, if filed, shall have been dismissed, (ii) all appeals of the Sale Order have been decided in favor of the Trustee, without any modification of the terms and conditions of the Sale Order.

(iv)     The Sale Order shall not be stayed or modified as of Closing.

(v)     No court order by any court shall be outstanding at Closing that enjoins, restrains, or prohibits the consummation of the transactions contemplated hereby; and

(vi)     All collateral agreements referenced in this Agreement shall have been executed, subject to Closing, in form acceptable to all parties thereto.

(b)     The obligations of Buyer under this Agreement are subject to the satisfaction, or waiver by Buyer, of the following further conditions precedent on or before Closing:

(i)     The Inventory conveyed to Buyer pursuant to this Agreement shall be substantially all of the Inventory identified on Debtor's "Inventory Summary" provided by the Trustee on a due diligence compact disc (the "Due Diligence CD") to parties potentially interested in purchasing some or all of Debtor's Assets in a file at Section L, Number 4 of the Due Diligence CD, and substantially all such Inventory shall be in commercially reasonable saleable condition;

(ii)     Seller shall, in all material respects, have performed all of its obligations and agreements and complied with all of its covenants contained in this Agreement to be performed and complied with by it on or prior to Closing;

(iii)     Seller shall have delivered to Buyer Seller's deliverables set forth in Section 2.3;

(iv)    At Buyer's cost, Seller shall have published in a newspaper or periodical selected by Buyer notice of the Sale Hearing (as defined below) prior to such Sale Hearing. The form, manner and timing of such publication shall have been reasonably calculated to provide notice to the entire world of the transactions contemplated hereby, including, without limitation, of the provisions and effect of <u>Section 7.13</u> below;

(v)    Seller shall deliver, and upon consummation of the transactions contemplated under and in accordance with this Agreement Buyer shall own, free and clear of any and all competing claims, interests, liens or encumbrances of any kind by any entity, all of the following:

(1)    Debtor's rights under and pursuant to that certain Patent License Agreement with Alpinespine, LLC dated August 7, 2006 (pursuant to assignment under Bankruptcy Code Section 365):

(2)    the Boehm/Melnick Patent (free and clear of any and all competing claims, interests, liens and encumbrances of any and all entities, including claims to ownership or rights to ownership of the Boehm/Melnick Patent, based upon theories of rescission or otherwise, asserted or claimed by the plaintiffs in the Boehm/Melnick Litigation, whether asserted or claimed in the Boehm/Melnick Litigation, the Bankruptcy Case or otherwise); and

(3)    Debtor's rights under and pursuant to the Jackson Agreement (pursuant to assignment under Bankruptcy Code Section 365); and

(vi)    The Closing shall have occurred on or before <u>September 30</u>, 2009.

(c)    Seller's obligations under this Agreement are subject to the satisfaction, or waiver by Seller, of the following further conditions precedent on or before Closing:

(i)    Buyer's representations and warranties contained herein shall be true in all material respects on and as of Closing;

(ii)    Buyer shall, in all material respects, have performed all of its obligations and agreements and complied with all of its covenants contained in this Agreement to be performed and complied with by it on or prior to Closing; and

(iii)    Buyer shall have delivered to Seller Buyer's deliverables set forth in <u>Section 2.4</u>.

2.3    <u>Seller's Deliverables</u>. At Closing, Seller shall deliver to Buyer the following:

(a)    A bill of sale; and

(b)    Other instruments of transfer reasonably required by Buyer to evidence the Assets' transfer to Buyer, including, without limitation, assignments with respect to any and all intellectual property registered, recorded or filed with any governmental authority, in form

FINAL EXECUTION VERSION

suitable for registration, recordation or filing with such governmental authority, in each case duly executed by Seller.

2.4     Buyer's Deliverables. At Closing, Buyer shall deliver to Seller the following:

(a)     The balance of the Cash Consideration pursuant to Section 1.2(a); and

(b)     Other instruments reasonably required by Seller to (i) evidence the Assets' transfer to Buyer; (ii) certify Buyer's approval and authorization of its execution of this Agreement and the transactions contemplated hereby and the taking of any and all actions deemed necessary or advisable to consummate the transactions contemplated herein; and (iii) certify Buyer's compliance with Sections 2.2(c)(i) and 2.2(c)(ii).

## ARTICLE 3
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller as follows:

3.1     Organization. Buyer is a corporation duly organized and validly existing under the laws of the State of Delaware.

3.2     Authority. Buyer has all requisite power and authority to enter into this Agreement and to perform its respective obligations hereunder. Prior to Closing, the execution, delivery and performance of this Agreement will have been duly and validly authorized and ratified by all necessary corporate and other action on the part of Buyer and no other proceedings on the part of Buyer are necessary to authorize this Agreement and the transactions contemplated hereby.

3.3     Validity. Assuming Buyer's and Seller's due authorization, execution and delivery of this Agreement, and assuming Bankruptcy Court approval and authorization, this Agreement constitutes Buyer's binding obligation, enforceable in accordance with its terms.

3.4     Litigation. There are no actions, suits, claims, investigations, hearings, or proceedings of any type pending (or, to Buyer's knowledge, threatened), at law or in equity, to which Buyer is a party that might affect Buyer's ability to close the transactions contemplated hereby.

3.5     Disclaimer. Buyer acknowledges that in making the decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely on the basis of its own independent investigation of the Business and the Assets and upon express written representations, warranties and covenants in this Agreement. Buyer acknowledges that except as set forth herein, Seller is not making any representations or warranties with respect to (i) any such documents, materials or other information, or (ii) the Assets' value, condition, merchantability, marketability, profitability, suitability or fitness for a particular use or purpose.

## ARTICLE 4
## TAX MATTERS

4.1   <u>Certain Taxes Other Than Federal, State and Local Income Taxes</u>. All transfer, documentary, sales, use, stamp, registration and other such taxes and fees (including penalties and interest) incurred in connection with this Agreement and arising out of the Assets' transfer to Buyer, but excluding Seller's income taxes gross receipts, franchise, capital gain and other similar taxes, shall be paid by Buyer when due, and Buyer shall, at its own expense, file all necessary tax returns and other documentation regarding such taxes and fees, and, if required by applicable law, Seller shall join in the execution of any such tax returns and other documentation. The parties shall cooperate with one another in the preparation of all tax returns, questionnaires, applications or other documents regarding any taxes or transfer, recording, registration or other fees which become payable in connection with the transactions that are required to be filed on or before Closing.

4.2   <u>Preparation and Filing of Certain Tax Forms; Determination and Allocation of Consideration</u>. The Purchase Price shall be allocated among the Assets in accordance with Schedule 4.2 which Schedule shall be prepared and agreed to by the parties within 10 days prior to Closing, but which will, if necessary, be amended after Closing to reflect any changes in the composition of the Assets after such allocation is agreed (the "Allocation"). Seller and Buyer agree to (i) be bound by the Allocation for tax purposes, (ii) act in accordance with the Allocation in the preparation of and filing of all tax returns (including, without limitation, filing Form 8594 with their United States federal income tax return for the taxable year that includes the date of the Closing) and in the course of any tax audit, tax review or tax litigation relating thereto and (iii) take no position inconsistent with the Allocation for income tax purposes, including United States federal and state income taxes. In addition, (i) neither Seller nor Buyer make any admission or agreement that such Allocation in any way establishes, determines or represents the actual value or appraisal of any of the Assets and (ii) the Allocation shall not be binding upon, nor shall it express or imply any agreement, conclusion or determination of value by or among, any secured or unsecured creditor of Debtor.

**ARTICLE 5**
**COVENANTS**

5.1   <u>Assignment of Contracts and Claims</u>. Notwithstanding any other provision of this Agreement, nothing in this Agreement or any related document shall be construed as an attempt to assign (a) any contract which, as a matter of law or by its terms, is nonassignable without the consent of the other parties thereto unless such consent has been given or unless such consent is not required by the Bankruptcy Code or unless the assignment of such contract shall have been approved by the Bankruptcy Court, pursuant to the Sale Order or otherwise, (b) any contract or claim as to which all of the remedies for the enforcement thereof enjoyed by Seller would not, as a matter of law or by their terms, pass to Buyer as an incident of the transfers and assignments to be made under this Agreement. Nothing in this Section shall relieve Seller of its obligations to obtain any consents or make any cure payments required for the transfer of the Assets and all rights thereunder to Buyer.

5.2   <u>Conveyance of Assets</u>.

(a)    At or prior to Closing, Seller shall execute any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things as are reasonably necessary to transfer, vest, perfect or confirm right, title, interest or ownership (of record or otherwise) of the Assets as requested by Buyer.

(b)    If at any time after Closing, Buyer is advised that any additional deeds bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are reasonably necessary to vest, perfect or confirm Buyer's ownership (of record or otherwise), right, title or interest in, to or under any or all of the Assets or otherwise to carry out the intent of this Agreement, Seller shall execute and deliver all deeds, bills of sale, instruments of conveyance, assignments and assurances and take and do all such other actions and things as may be reasonably requested by Buyer in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer (including with respect to Non-Material IP) or otherwise to carry out this Agreement.

5.3    Bankruptcy Actions.

(a)    The Trustee shall, in accordance with all applicable requirements of, and procedures under, the Bankruptcy Code obtain entry of a Bankruptcy Court order which among other things, approves bidding procedures in the form attached hereto as Exhibit A (such motion, the "Sale Motion" and such bidding procedures, the "Bidding Procedures").

(b)    In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, subject to Bankruptcy Court approval Buyer shall be entitled to an "Expense Reimbursement" as described herein. Seller shall pay to Buyer promptly upon the effective date of termination of this Agreement in accordance with and subject to Section 6.1(c) the amount of $250,000.00, which obligation, if it arises, shall constitute a "superpriority" administrative expense under Bankruptcy Code Sections 105, 364(c)(1), 503(b) and 507(a)(2) and shall be payable immediately in accordance with this Agreement without further order of the Bankruptcy Court pursuant to the order associated with the Sale Motion (such amount, the "Expense Reimbursement"). In addition, the Sale Motion shall provide for (i) an initial overbid protection in the amount of $100,000.00 over and above the Cash Consideration and (ii) approval in all material respects of the Bidding Procedures (collectively, the "Overbid Protection").

(c)    This Agreement is subject to Bankruptcy Court approval and Seller's consideration of higher or better competing offers in accordance with the Bidding Procedures (any such offer, a "Competing Offer"). Sellers have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Assets to prospective purchasers.

(d)    Buyer agrees to cooperate with Seller in connection with furnishing information pertaining to the satisfaction of the requirement of adequate assurances of future performance of the Assumed Contracts as required under Bankruptcy Code Section 365.

## ARTICLE 6
## TERMINATION

6.1    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing Date:

(a)    By Buyer's and Seller's mutual written consent;

(b)    By Buyer if Seller fails to perform, in any material respect, any of its covenants, agreements, or obligations under this Agreement, and any such failure is not cured within 10 business days after written notice from Buyer;

(c)    Automatically, and without further action or notice by either party or Bankruptcy Court approval, if the Bankruptcy Court shall enter an order approving a Competing Offer and the transaction contemplated by such Competing Offer is thereafter consummated; or

(d)    By Seller if Buyer breaches any of its representations or warranties in any material respect herein or fails to perform, in any material respect, any of its covenants, agreements, or obligations under this Agreement, and any such breach or failure is not cured within 10 business days after written notice from Seller.

6.2    <u>Effect of Termination</u>. In the event of this Agreement's termination in accordance with Sections 6.1(b) or (c), Seller shall, in addition to any other obligation of this Agreement to be performed on or after termination, promptly return the Deposit and, if a termination in accordance with <u>Section 6.1(c)</u>, pay to Buyer the Expense Reimbursement within three (3) business days thereafter. In the event of any termination of this Agreement other than pursuant to <u>Section 6.1(d)</u> above, Seller shall, as soon as reasonably practicable but in any event within three (3) business days after consummation of the purchase and sale transaction contemplated in such Competing Offer, return to Buyer the entire Deposit (with any interest earned thereon) paid by Buyer hereunder. Buyer's rights and remedies resulting from any breach by Seller of his obligations hereunder shall be preserved notwithstanding termination of this Agreement in accordance with this <u>Article 6</u>.

## ARTICLE 7
## GENERAL

7.1    <u>Assignment</u>. This Agreement and the parties' rights hereunder may not be assigned (except by operation of law) and shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns. Notwithstanding the immediately preceding sentence, Buyer may assign its rights hereunder to one or more of its wholly owned direct or indirect subsidiaries so long as Buyer remains obligated to pay the Purchase Price hereunder and such assignment does not alter the Trustee's ability to assume and assign contracts.

7.2    <u>Signatures</u>. Signatures on this Agreement delivered by fax or electronic mail shall be considered original signatures for purposes of effectiveness of this Agreement.

7.3 <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts which may be delivered by facsimile or electronic mail, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

7.4 <u>Fees and Expenses</u>. Whether or not the transactions herein contemplated shall be consummated, (a) Seller will pay the fees, expenses and disbursements of Seller, and its agents, representatives, accountants and counsel incurred in connection with the subject matter of this Agreement and any amendments thereto, and (b) Buyer will pay the fees, expenses and disbursements of Buyer and its agents, representatives, accountants and counsel incurred in connection with the subject matter of this Agreement and any amendments hereto.

7.5 <u>Counsel</u>. Each party hereto warrants and represents that such party has been afforded the opportunity to be represented by counsel of its choice in connection with the execution of this Agreement and has had ample opportunity to read, review and understand the provisions of this Agreement.

7.6 <u>Notices</u>. Any notice or communication required or permitted hereunder shall be sufficiently given if sent by first class mail, postage prepaid:

    (a)    If to Seller, addressed to Trustee at:

> Warren E. Agin, Esquire, Trustee
> For Chapter 7 Debtor, Innovative Spinal Technologies, Inc.
> c/o Swiggart & Agin, P.C.
> 197 Portland Street, Fourth Floor
> Boston, MA 02114
> Fax: (617) 723-2830

    (b)    With a copy to its counsel at:

> Eckert Seamans Cherin & Mellott, LLC
> Two International Place, 16th Floor
> Boston, MA 02110
> ATTN: John Loughnane, Esquire
> Fax: (617) 342-6899

    (c)    If to Buyer, addressed to it at:

> Integra LifeSciences Corporation
> 311 Enterprise Drive
> Plainsboro, NJ 08536
> ATTN: General Counsel
> Fax: (609) 275-1082

    (d)    With a copy to its counsel at:

{K0402786.2}
DM3\1078179.9

-12-

Jeffrey D. Sternklar, Esq.
Duane Morris LLP
470 Atlantic Avenue
Boston, Massachusetts 02210,
Facsimile No. 857-488-3034,
e-mail jdsternklar@duanemorris.com,

and

Margery N. Reed, Esq.
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103-4196
Fax. No. 215-979-1020
e-mail mreed@duanemorris.com

7.7 <u>Opportunity to Investigate</u>. All of the parties have had an opportunity to investigate and evaluate the Assets being purchased, have relied on independent professional advice and, therefore, agree that the price to be paid by Buyer for the Assets is reasonably equivalent value for the Assets.

7.8 <u>Governing Law and Jurisdiction</u>. THIS AGREEMENT (AND ALL DOCUMENTS, INSTRUMENTS, AND AGREEMENTS EXECUTED AND DELIVERED PURSUANT TO THE TERMS AND PROVISIONS HEREOF (SUCH DOCUMENTS, THE "ANCILLARY DOCUMENTS")) SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE INTERNAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF. BUYER AND SELLER FURTHER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (A) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT AND (B) THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES. BUYER CONSENTS TO AND EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION; *PROVIDED, HOWEVER*, THAT IF THE BANKRUPTCY COURT REFUSES TO ACCEPT JURISDICTION OVER ANY SUCH DISPUTE, THEN ANY STATE OR FEDERAL COURT LOCATED IN THE COUNTY OF SUFFOLK, COMMONWEALTH OF MASSACHUSETTS SHALL HAVE JURISDICTION OVER SUCH DISPUTE AND BUYER AND SELLER HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT IN ANY SUCH CASE.

7.9    Conflicts. In case any provision in this Agreement shall conflict with any part of the Sale Order, the terms of the Sale Order shall control and shall be given precedence by the parties hereto over any such conflicting term in this Agreement.

7.10    Captions. The captions in this Agreement are for convenience only and shall not be considered a part hereof or affect the construction or interpretation of any provisions of this Agreement.

7.11    Entire Agreement. This Agreement and the documents delivered pursuant hereto constitute the entire agreement and understanding between Seller and Buyer and supersede any prior agreement and understanding relating to this Agreement's subject matter. This Agreement may be modified or amended only by a written instrument executed by Seller and Buyer acting through their duly elected or appointed officers.

7.12    No Third Party Beneficiary.    The terms and conditions of this Agreement inure solely to the benefit of the parties hereto. No third parties are intended to be beneficiaries of, or are or shall rely on, any of the terms and conditions of this Agreement.

7.13    Buyer Not Successor to Debtor or Trustee.    Neither Buyer nor its designee(s) are or shall be deemed to be successors to Debtor, Seller or the Estate, and neither Buyer nor its designee(s) shall incur any liability to any party under any theory of successor liability or similar theory or principle.

7.14    Limitation on Damages arising from Buyer's Breach.  Seller's sole remedy in the event that Buyer materially breaches its obligations hereunder shall be the retention by Seller of Buyer's Deposit in full satisfaction of any claims (including, without limitation, claims for incidental, consequential or multiple damages) Seller may have against Buyer resulting from Buyer's breach.

*[REMAINDER OF PAGE LEFT BLANK; SIGNATURES ON FOLLOWING PAGE]*

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

**SELLER:**

Warren E. Agin, Esquire, as
Chapter 7 Trustee for Debtor,
Innovative Spinal Technologies, Inc.
and not individually

**BUYER:**

INTEGRA LIFESCIENCES CORPORATION

By: _____
Name: _____
Title: _____

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

**SELLER:**

_____

Warren E. Agin, Esquire, as
Chapter 7 Trustee for Debtor,
Innovative Spinal Technologies, Inc.
and not individually

**BUYER:**

INTEGRA LIFESCIENCES CORPORATION

By: _____

Name: _John B. Henneman, III_

Title: _Chief Financial Officer_

## Exhibit A
### Bidding Procedures

[See Debtor's Motion entitled:

TRUSTEE'S MOTION FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION W TH SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING THE EXPENSE REIMBURSEMENT, (C) SCHEDULING AN AUCTION AND HEARING TO APPROVE THE SALE AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (D) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (II) AN ORDER (A) APPROVING THE PROPOSED SALE, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND (C) GRANTING CERTAIN RELATED RELIEF ,

as filed with the Bankruptcy Court as of the date hereof]

Schedule 1.1
Assets

The Assets shall include (with the exception of any Excluded Assets):

- all assets set forth on <u>Schedule A</u> to the Bidding Procedures approved by the Bankruptcy Court.

- substantially all of the Inventory identified on Debtor's "Inventory Summary" provided by the Trustee on the Due Diligence CD at Section L, Number 4 of the Due Diligence CD.

## Schedule 1.8
### Excluded Assets

The following patent applications, and rights and agreements related thereto (the Tsunami Medtech patents; see IST nos. 09-006-P2, P3 & P4):

      60/705,081 Tissue Vaporization Instrument

      11/462,324 Tissue Vaporization Instrument

      60/720,975 Tissue Evacuation Device

      60/780,924 Tissue Evacuation Device

      60/814,937 Tissue Evacuation Device

The following patent applications, and rights and agreements related thereto (the Hochschuler patents; see IST no. 13-001-P1):

      60/947,746 Facet Fusion Implant

      12/168,030 Facet Fusion Implant

      PCT/US08/69259 Facet Fusion Implant

Debtor's rights in, to or against insurance policies, other than with respect to product liability claims.

Debtor's claims against officers, directors or other fiduciaries, or other claims under which stockholders of the corporation may have a derivative cause of action.

Causes of action arising pursuant to the so-called "avoidance powers" provisions of the Bankruptcy Code under 11 U.S.C. §§541 – 553

Debtor's accounts receivable

## Schedule 4.2
### Allocation of Consideration

| Class | Description | Consideration |
|-------|-------------|---------------|
| I | Cash | |
| II | Actively traded personal property | |
| III | Receivables | |
| IV | Inventory | |
| V | Other assets including real and personal property | |
| VI | Intangibles other than goodwill | |
| VII | Goodwill | |

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 7 |
|  | : |  |
| INNOVATIVE SPINAL | : | Case No. 09-14415 (FJB) |
| TECHNOLOGIES, INC., | : |  |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

# SEALED ALL ASSET AUCTION BID FORM

The United States Bankruptcy Court for the District of Massachusetts ("Bankruptcy Court")
authorized Warren E. Agin, the chapter 7 trustee of the above Debtor, to conduct an auction for the
sale of the Debtor's assets pursuant to that certain Order dated August 3, 2009 ("Bid Procedures
Order"). Each capitalized term used but not otherwise defined herein shall have the meaning set
forth in the Bid Procedures Order.

1.   The Starting Bid for the All Asset Auction is the offer made by Biomet, Inc. ("Biomet"), or its
designee, in that certain letter (and attachments) to the Trustee dated August 14, 2009 submitted in
accordance with the Bid Procedures Order. That offer included, among other items, Cash
Consideration of $5,500,000.

2. The Bid Procedures Order requires that if Biomet elects to submit a sealed bid at the auction, that
the amount shall be at least $350,000 higher than the Starting Bid (thus, at least **$5,850,000**).

3. The Bid Procedures order requires that if Integra LifeSciences Corporation ("Integra") elects to
submit a sealed bid at the auction, that the amount shall be at least **$5,575,000** (which amount takes
into account the Auction Threshold set forth in the Bid Procedures Order).

4. In accordance with the Bid Procedures Order, _Biomet, Inc_____(company
name) hereby submits the offer set forth in the attached revised Asset Purchase Agreement, marked
to show changes to the version it previously submitted .  Among other items, this offer includes the
following items:

    a. Cash Consideration:    $ _8,000,000.00 ** (cash)_____

    b. Assumed Liabilities:    _none_____

    c. Assumed Contracts consist of those contracts listed at the attached **Exhibit A**.

{K0404716.1}

1) all shares of stock in [Realication] included
2) all shares of stock in Spinecular, Inc.
3) such other shares of stock
that may become known to the Trustee
subsequently to the closing.

• All executory contracts to be rejected, other than
the ones requested to be assumed on Exhibit
A hereof (provided, however, said assumption is not
a condition to closing)

## REDACTED

✱ Closing to occur upon Trustee's assignment of
all domestic patents and pending applications, ~~and~~
delivery of Bill of Sale and entry of sale order.

d. Excluded Assets, if any, in
   addition to those identified in
   **Schedule 1.8** of the original
   Asset Purchase Agreement:

   _n/a_

e. Proposed Treatment of Objectors:

   i)    X-Spine          _not assume_

   ii)   Jackson          _not assume_

   iii)  Millstone        _Trustee to pay cure in amount
                          of $54,310.25 at closing, purchaser
                          has reached separate agreement with
                          Millstone_

   iv)   Boehm-Melnick    _trustee to deliver Boehm Melnick
                          patent + patent application in
                          accordance with Biomet APA_

5.  This offer is submitted in compliance with the Bid Procedures Order.

_Biomet, Inc._
Name of Corporate Entity Submitting Bid

By:    _Glen Kashuba_
Name:  _Glen Kashuba_
Its:   _Senior Vice President_
       Hereunto duly authorized

{K0404716.1}

## Exhibit A

### Assumed Contracts

For each contract, please indicate whether the estate or the bidder is expected to pay cure costs.

**(If none listed, "None")**

1) All pre-petition NDA's signed by ISI - no cure's
2) All agreements identified in the folder- labeled
D-7. Confidentiality, Non- Disclosure " on due
diligence disk provided by trustee. Trustee
to use best efforts to assign said agreements,
but assignment is not a condition to closing.
Provided further that if agreements are
not assigned, §11(h) of the Buyer Asst.
shall include the transfer of all rights,
claims and causes of action
under those agreements.

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("Agreement") dated as of the _____ day of August, 2009, is by and between Warren B. Agin, Chapter 7 Trustee ("Trustee" or "Seller") of Innovative Spinal Technologies, Inc., a Delaware corporation ("Debtor"), pursuant to Debtor's bankruptcy case under Chapter 7 of Title 11 of the United States Bankruptcy Code ("Bankruptcy Case"), and Biomet, Inc. ("Buyer").

### WITNESSETH:

**WHEREAS,** on May 15, 2009 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court");

**WHEREAS,** before the Petition Date, Debtor was engaged in business as a spine technology company, headquartered in Mansfield, Massachusetts, which developed motion preservation and minimally invasive treatments for spinal disorders; and

**WHEREAS,** Seller desires to sell Seller's Assets (as hereinafter defined), and Buyer desires to purchase such Assets pursuant to the terms and conditions of this Agreement and pursuant to an order of the Bankruptcy Court approving such sale ("Sale Order"), under Bankruptcy Code Section 363, such Sale Order to include the assumption and assignment of certain executory contracts as provided herein pursuant to Bankruptcy Code Section 365;

**NOW THEREFORE,** in consideration of the promises, covenants and other consideration described herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows, intending to be legally bound:

## ARTICLE 1
## TRANSFER OF ASSETS AND PURCHASE PRICE

1.1    Assets. Pursuant to the Sale Order of the Bankruptcy Court approving the same and subject to the terms and conditions of this Agreement, Seller agrees to sell, convey, transfer and deliver to Buyer (or one or more of its designee(s)) at Closing (as hereinafter defined) all Seller's right, title and interest in and to all of Debtor's assets including, without limitation, those set forth on Schedule 1.1 (collectively, the "Assets"), free from all claims, defaults, liens, taxes, debts, interests and encumbrances of any kind, except the Assumed Liabilities (as hereinafter defined), but excluding those certain assets specifically excluded in Schedule 1.8 (the "Excluded Assets"). Without limiting the generality of the immediately preceding sentence, the Assets include, but are not limited to:

46501/0001-5920147v3

(a)     All Assets in connection with Debtor's "Paramount MIS" and "Paramount Open" lines of business (such Debtor's "Paramount MIS" and "Paramount Open" lines of business shall be referred to as the "Business;" all lines of business other than the Business shall be referred to as the "Other Business;" and the Business and the Other Business will be referred to as the "Combined Business");

(b)     All inventories, wherever located (including raw materials, work-in-process, finished goods and other inventory items), used or useful in, manufactured at or otherwise relating to the Combined Business, or any part thereof (collectively, "Inventory"), including, without limitation, (i) all such Inventory located or stored at Debtor's former operating facilities, and (ii) all such finished goods Inventory (wherever located) manufactured in the Combined Business or any part thereof, and held for sale on behalf of Seller by third parties, on consignment or otherwise;

(c)     All machinery, equipment, fixtures and other tangible assets relating *including but not limited to, Servers (which include)* to or used by Debtor in connection with the Combined Business, or any part thereof;

(d)     All information technology systems implemented or used in the Combined Business, or any part thereof, including, without limitation, all equipment and software relating thereto but only to the extent any corresponding license for such information technology is assumable and assignable pursuant to Bankruptcy Code Section 365;

(e)     all regulatory filings, clearances, approvals and permissions and documents including device design documents, quality documents, submissions and correspondence with the United States Food and Drug Administration and any and all other federal, state, foreign or international regulatory bodies in any way related to or used in the Combined Business, or any part thereof;

(f)     (Intentionally deleted);

(g)     All equipment leases, contract rights and other rights with respect to machinery and equipment owned by parties other than Debtor's bankruptcy estate ("Estate"), as well as such other contracts and agreements relating to the Combined Business (or any part thereof) as Buyer may, in its sole discretion, elect to acquire and assume prior to the Closing Date;

(h)     All claims, causes of action, demands *and* all rights *and remedies* with respect to any of them (excluding causes of action arising pursuant to the so-called "avoidance powers" provisions of the Bankruptcy Code, under 11 U.S.C. §§541 - 553 or any causes of action of a derivative nature that could be asserted by the Trustee) arising from or related to the Combined Business or any part thereof;

2

(i)      All intellectual property of any kind and character (other than as disclosed on Schedule 1.8), including, without limitation, any and all patents, patent applications, trade secrets, technology, know-how, inventions, processes, technical information and data, tools and dies, designs, plans, drawings, diagrams, schematics and other proprietary information and intellectual property relating to or used in connection with the Combined Business or any part thereof; wherever located, including, without limitation, (i) all of the foregoing which relate to the Combined Business, (ii) that certain patent and patent application formerly owned by Frank H. Boehm, Jr. and Benedetta D. Melnick and assigned by them to Debtor, which was filed on December 17, 2002 and which bears application serial number 10/320,989, which is now issued as U.S. Patent No. 7,306,603, together with all its continuations, continuations-in-part, divisionals, substitutes, related provisionals and related non-provisional applications, including any and all foreign counterparts to all of the foregoing and any and all extensions thereof, and including any and all reissues and reexaminations of all of the foregoing; ("Boehm/Melnick Patent"), which shall be transferred to Buyer by Seller free and clear of, inter alia, any and all claims of ownership to such patent, or rights to acquire ownership of such patent, by Frank Boehm, Jr., Benedetta Melnick, Creative NeuroScience Applications LLC, including as asserted by any of them in civil action number 6:09-cv-00131-DNH-GHL, Boehm, et al. v. Innovative Spinal Technologies Corporation, et al., in the United States District Court for the Northern District of New York ("Boehm/Melnick Litigation"), the Bankruptcy Case or otherwise, ~~(iii) all of the Estate's right, title, and interest in and to the technology, patented or otherwise, described in that certain "Development and License Agreement (Polyaxial Screw)" dated effective November 1, 2004, and as amended June 1, 2005, between and among Roger P. Jackson, M.D., Midwest Spine Foundation, SMS Trust under Trust Agreement dated August 11, 1995 and Debtor (the "Jackson Agreement"), and (iv)~~ any and all other intellectual property, or interest in intellectual property, that is property of the Estate and/or that was property of IST (it being understood and agreed that Buyer's ownership of all of the foregoing shall be exclusive and that Seller is not retaining any rights therein and shall not sell or provide any of the foregoing to any purchaser of any other assets or business of Seller or use any of the foregoing for any purpose following the Closing Date);

(j)      All trademarks, trade-names, ^(trade secrets,) customer lists and data, marketing plans and documents, advertising, sales and promotional materials, marketing studies and reports and other documents and materials developed or used in connection with or otherwise relating to the Combined Business, or any part thereof; including all of Seller's right, title and interest in and to the terms "Paramount" and any phrase or phrases including the term "Paramount", and including all of the goodwill in the business and products associated with the Business and with the Combined Business; and

(k)      All books, records, ledgers, operating data, documents, correspondence and other data, information, intangible properties, rights and assets relating to the Combined Business or any part thereof.

3

1.2     Consideration. Buyer shall pay to Seller the following consideration for the Assets (the "Purchase Price"):

(a)     Five Million Five Hundred Thousand Dollars ($5,500,000) (the "Cash Consideration"). The Cash Consideration shall be paid as follows:

(i)     Upon transmittal to the Trustee of Buyer's signature to this Agreement, Buyer shall provide a deposit of Two Hundred Seventy Five Thousand Dollars ($275,000.00) ("Deposit"), to be held by Seller in Seller's segregated client trust account pending the Closing, and applied to the Purchase Price at Closing. Failure by Buyer to close in accordance with the terms and conditions of this Agreement, sole y as a result of Buyer's breach of such terms and conditions, will result in Buyer forfeiting the Deposit in full satisfaction of any claims Seller may have against Buyer resulting from Buyer's breach, provided however that in no event shall Buyer have any limitation of liability by virtue of this Agreement for any violation of Bankruptcy Code Section 363(n).

(ii)     The balance of the Cash Consideration shall be paid at Closing.

and

(b)     Buyer's assumption of the Assumed Liabilities pursuant to Section 1.6 of this Agreement.

1.3     Allocation of Proceeds. The parties agree that prior to the Closing Date, they or their representatives shall in good faith allocate the Purchase Price among the Assets.

1.4     Delivery of Cash Consideration. At Closing, Buyer shall pay to Seller the balance of the Cash Consideration in immediately available funds by wire transfer or certified or cashier's check, as specified by Seller in written instruction delivered to Buyer at least two (2) business days prior to Closing.

1.5     Assignment of Contracts, Leases and Other Assets. Subject to the terms and conditions of this Agreement, as of Closing, Seller shall assign and transfer to Buyer pursuant to 11 U.S.C. §365 all Seller's right, title and interest in and to Debtor's contracts identified by Buyer prior to Closing (the "Assigned Contracts").

1.6     Assumption of Liabilities. As partial consideration for the Assets, Buyer shall assume, perform and discharge, by Bankruptcy Court order, pursuant to Bankruptcy Code Section 365, from and after Closing, the following Seller obligations (the "Assumed Liabilities"):

4

(a)    All Seller's liabilities under the Assigned Contracts arising after the Closing; and

(b)    All Seller's obligations under any Assigned Contract arising after the Closing.

1.7    Excluded Liabilities. Except for the Assumed Liabilities, Buyer shall assume no other debts, liabilities, or obligations of Seller.

1.8    Excluded Assets. The Assets to be conveyed by Seller to Buyer hereunder shall not include any asset, tangible or intangible, set forth as Excluded Assets on Schedule 1.8. Buyer shall have the right to amend Schedule 1.8 by adding items selected by Buyer in its sole discretion to the Excluded Assets, but Buyer shall not be entitled to a reduction in the Cash Consideration as a result of any additions Buyer elects to make to Schedule 1.8.

### ARTICLE 2
### CLOSING

2.1    Closing. The transfers and deliveries referred to in Article 1 hereof (the "Closing") shall take place at the office of Eckert Seamans Cherin & Mellott, LLC located at Two International Place, 16th Floor, Boston, Massachusetts 02110, or by such other means, including facsimile, at such other time and date as the parties may agree or such exchange actually occurs (the "Closing Date"). Notwithstanding anything in this Agreement to the contrary, if Closing is consummated, Closing's effective time shall be 12:01 a.m. on the Closing Date. Absent agreement by the parties otherwise, the Closing shall occur no later than the 11th business day after Sale Order (as defined below) becomes a "Final Order" (as defined below).

2.2    Conditions to Closing.

(a)    The obligations of Buyer and Seller under this Agreement are subject to the satisfaction or waiver by Buyer or Seller, as applicable, of the following conditions precedent on or before Closing:

(i)    Intentionally omitted;

(ii)    The Bankruptcy Court shall have entered the Sale Order, which Sale Order shall be in form and substance reasonably satisfactory to Buyer and its counsel, and shall, among other things, include a finding that Buyer is a "good faith" purchaser of the Assets within the meaning of Bankruptcy Code Section 363(m) and is entitled to the protections afforded thereby, the sale of the Assets is in exchange for reasonably equivalent value and fair consideration, that the sale of the Assets to Buyer is not subject to avoidance under Bankruptcy Code Section 363(n), and shall include the following additional provisions, without limitation,

(A)      authorizing, empowering and directing Seller to perform all acts, execute and deliver all documents, that are reasonably necessary, proper or desirable as requested by Buyer to implement and consummate the purchase and sale contemplated by this Agreement, all without further order of the Bankruptcy Court or notice to any entities;

(B)      determining that upon consummation of the purchase and sale contemplated by this offer Buyer shall have good and marketable title to all of the Assets free and clear of any and all claims, interests, liens and encumbrances including, without limitation, with respect to the Boehm/Melnick Patent, Buyer shall own the Boehm/Melnick Patent, and can practice the patented technology described in the Boehm/Melnick Patent, free and clear of any and all competing claims, interests, liens and encumbrances of any and all entities, including claims to ownership or rights to ownership (on theories of rescission or otherwise) of the Boehm/Melnick Patent asserted or claimed by the plaintiffs in the Boehm/Melnick Litigation, whether asserted or claimed in the Boehm/Melnick Litigation, the Bankruptcy Case or otherwise;

(C)      determining that Seller is authorized and empowered to execute and deliver documents on the Estate's behalf; and to perform acts on the Estate's behalf to consummate and perform Seller's obligations to sell the Assets to Buyer, all without further order of the Court or notice to any entity whatsoever;

(D)      providing Buyer with rights of access to the books, records, premises and property of the Estate, including without limitation the Assets, upon notice with any expense to be borne by Buyer at any reasonable time prior to the Closing, for inspection and testing to ensure compliance with the conditions of Closing;

(E)      providing that Buyer shall not be deemed a successor and shall under no circumstances incur or be liable for any debts or liabilities of Seller or Debtor or claims in the Bankruptcy Case, under any theory of successor liability or otherwise, and

(F)      providing that from and after Closing, Buyer's rights to practice all of Debtor's intellectual property, including, without limitation, pursuant to licenses assigned to Buyer as part of the transaction contemplated hereunder, are free from interference of any kind by any entity;

(G)      providing a mechanism, satisfactory to Buyer and Seller, pursuant to which any Inventory held by a third party shall be obtained by Buyer;

(H)      providing that the Assigned Contracts shall be transferred and assigned to Seller, and following Closing, shall remain in full force and effect for the benefit of the Buyer in accordance with their respective terms

6

notwithstanding any provision in any such Assigned Contract that prohibits, restricts, or conditions such transfer or assignment;

(I)    providing that Seller shall cure all defaults under the Assigned Contracts pursuant to Bankruptcy Code Section 365(b); and

(J)    containing such other terms and conditions as may reasonably be requested by Buyer.

(iii)    The Sale Order shall be a "Final Order". The Sale Order shall be a Final Order at the later of the time when (i) the period for commencement of all appeals of the Sale Order shall have passed, with no appeal having been filed, or, if filed, shall have been dismissed, (ii) all appeals of the Sale Order have been decided in favor of the Trustee, without any modification of the terms and conditions of the Sale Order

(iv)    The Sale Order shall not be stayed or modified as of Closing;

(v)    No court order by any court shall be outstanding at Closing that enjoins, restrains, or prohibits the consummation of the transactions contemplated hereby; and

(vi)    All collateral agreements referenced in this Agreement shall have been executed, subject to Closing, in form acceptable to all parties thereto.

(b)    The obligations of Buyer under this Agreement are subject to the satisfaction, or waiver by Buyer, of the following further conditions precedent on or before Closing:

(i)    The Inventory conveyed to Buyer pursuant to this Agreement shall be substantially all of the Inventory identified on Debtor's "Inventory Summary" provided by the Trustee on a due diligence compact disc (the "Due Diligence CD") to parties potentially interested in purchasing some or all of Debtor's Assets in a file at Section L, Number 4 of the Due Diligence CD, and substantially all such Inventory shall be in commercially reasonable saleable condition;

(ii)    Seller shall, in all material respects, have performed all of its obligations and agreements and complied with all of its covenants contained in this Agreement to be performed and complied with by it on or prior to Closing;

(iii)    Seller shall have delivered to Buyer Seller's deliverables set forth in Section 2.3;

(iv)    Intentionally omitted;

7

(v)     Seller shall deliver, and upon consummation of the transactions contemplated under and in accordance with this Agreement Buyer shall own, free and clear of any and all competing claims, interests, liens or encumbrances of any kind by any entity, all of the following:

(1)     Intentionally omitted;

(2)     the Boehm/Melnick Patent (free and clear of any and all competing claims, interests, liens and encumbrances of any and all entities, including claims to ownership or rights to ownership of the Boehm/Melnick Patent, based upon theories of rescission or otherwise, asserted or claimed by the plaintiffs in the Boehm/Melnick Litigation, whether asserted or claimed in the Boehm/Melnick Litigation, the Bankruptcy Case or otherwise); and

(3)     Intentionally omitted; and

(vi)     The Closing shall have occurred on or before September 30, 2009.

(c)     Seller's obligations under this Agreement are subject to the satisfaction, or waiver by Seller, of the following further conditions precedent on or before Closing:

(i)     Buyer's representations and warranties contained herein shall be true in all material respects on and as of Closing;

(ii)     Buyer shall, in all material respects, have performed all of its obligations and agreements and complied with all of its covenants contained in this Agreement to be performed and complied with by it on or prior to Closing; and

(iii)     Buyer shall have delivered to Seller Buyer's deliverables set forth in Section 2.4.

2.3     Seller's Deliverables.  At Closing, Seller shall deliver to Buyer the following:

(a)     A bill of sale; and

(b)     Other instruments of transfer reasonably required by Buyer to evidence the Assets' transfer to Buyer, including, without limitation, assignments with respect to any and all intellectual property registered, recorded or filed with any governmental authority, in form suitable for registration, recordation or filing with such governmental authority, in each case duly executed by Seller.

8

2.4    Buyer's Deliverables.  At Closing, Buyer shall deliver to Seller the following:

(a)    The balance of the Cash Consideration pursuant to Section 1.2(a) and

(b)    Other instruments reasonably required by Seller to (i) evidence the Assets' transfer to Buyer; (ii) certify Buyer's approval and authorization of its execution of this Agreement and the transactions contemplated hereby and the taking of any and all actions deemed necessary or advisable to consummate the transactions contemplated herein; and (iii) certify Buyer's compliance with Sections 2.2(c)(i) and 2.2(c)(ii).

## ARTICLE 3
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller as follows:

3.1    Organization.  Buyer is a corporation duly organized and validly existing under the laws of the State of Indiana.

3.2    Authority.  Buyer has all requisite power and authority to enter into this Agreement and to perform its respective obligations hereunder.  Prior to Closing, the execution, delivery and performance of this Agreement will have been duly and validly authorized and ratified by all necessary corporate and other action on the part of Buyer and no other proceedings on the part of Buyer are necessary to authorize this Agreement and the transactions contemplated hereby.

3.3    Validity.  Assuming Buyer's and Seller's due authorization, execution and delivery of this Agreement, and assuming Bankruptcy Court approval and authorization, this Agreement constitutes Buyer's binding obligation, enforceable in accordance with its terms.

3.4    Litigation.  There are no actions, suits, claims, investigations, hearings, or proceedings of any type pending (or, to Buyer's knowledge, threatened), at law or in equity, to which Buyer is a party that might affect Buyer's ability to close the transactions contemplated hereby.

3.5    Disclaimer.  Buyer acknowledges that in making the decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely on the basis of its own independent investigation of the Business and the Assets and upon express written representations, warranties and covenants in this Agreement.  Buyer acknowledges that except as set forth herein, Seller is not making any representations or warranties with respect to (i) any such documents, materials or other information, or (ii) the Assets' value, condition, merchantability, marketability, profitability, suitability or fitness for a particular use or purpose.

9

## ARTICLE 4
## TAX MATTERS

4.1    Certain Taxes Other Than Federal, State and Local Income Taxes. All transfer, documentary, sales, use, stamp, registration and other such taxes and fees (including penalties and interest) incurred in connection with this Agreement and arising out of the Assets' transfer to Buyer, but excluding Seller's income taxes gross receipts, franchise, capital gain and other similar taxes, shall be paid by Buyer when due, and Buyer shall, at its own expense, file all necessary tax returns and other documentation regarding such taxes and fees, and, if required by applicable law, Seller shall join in the execution of any such tax returns and other documentation. The parties shall cooperate with one another in the preparation of all tax returns, questionnaires, applications or other documents regarding any taxes or transfer, recording, registration or other fees which become payable in connection with the transactions that are required to be filed on or before Closing.

4.2    Preparation and Filing of Certain Tax Forms; Determination and Allocation of Consideration. The Purchase Price shall be allocated among the Assets in accordance with Schedule 4.2 which Schedule shall be prepared and agreed to by the parties within 10 days prior to Closing, but which will, if necessary, be amended after Closing to reflect any changes in the composition of the Assets after such allocation is agreed (the "Allocation"). Seller and Buyer agree to (i) be bound by the Allocation for tax purposes, (ii) act in accordance with the Allocation in the preparation of and filing of all tax returns (including, without limitation, filing Form 8594 with their United States federal income tax return for the taxable year that includes the date of the Closing) and in the course of any tax audit, tax review or tax litigation relating thereto and (iii) take no position inconsistent with the Allocation for income tax purposes, including United States federal and state income taxes. In addition, (i) neither Seller nor Buyer make any admission or agreement that such Allocation in any way establishes, determines or represents the actual value or appraisal of any of the Assets and (ii) the Allocation shall not be binding upon, nor shall it express or imply any agreement, conclusion or determination of value by or among, any secured or unsecured creditor of Debtor.

## ARTICLE 5
## COVENANTS

5.1    Assignment of Contracts and Claims. Notwithstanding any other provision of this Agreement, nothing in this Agreement or any related document shall be construed as an attempt to assign (a) any contract which, as a matter of law or by its terms, is nonassignable without the consent of the other parties thereto unless such consent has been given or unless such consent is not required by the Bankruptcy Code or unless the assignment of such contract shall have been approved by the Bankruptcy Court, pursuant to the Sale Order or otherwise, or (b) any contract or claim as to which all of the remedies for the enforcement thereof enjoyed by Seller would not, as a matter of law or by their

10

terms, pass to Buyer as an incident of the transfers and assignments to be made under this Agreement. Nothing in this Section shall relieve Seller of its obligations to obtain any consents or make any cure payments required for the transfer of the Assets and all rights thereunder to Buyer.

5.2    Conveyance of Assets.

(a)    At or prior to Closing, Seller shall execute any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things as are reasonably necessary to assign, transfer, vest, perfect or confirm right, title, interest and/or ownership (of record or otherwise) of the Assets as requested by Buyer.

(b)    If at any time after Closing, Buyer is advised that any additional deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are reasonably necessary to assign, transfer, vest, perfect or confirm Buyer's ownership (of record or otherwise), right, title and/or interest in, to or under any or all of the Assets or otherwise to carry out the intent of this Agreement, Seller shall execute and deliver all deeds, bills of sale, instruments of conveyance, assignments and assurances and take and do all such other actions and things as may be reasonably requested by Buyer in order to assign, transfer, vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer (including with respect to Non-Material IP) or otherwise to carry out this Agreement.

5.3    Bankruptcy Actions.

(a)    Intentionally omitted.

(b)    Intentionally omitted.

(c)    This Agreement is subject to Bankruptcy Court approval pursuant to the Sale Order.

(d)    Buyer agrees to cooperate with Seller in connection with furnishing information pertaining to the satisfaction of the requirement of adequate assurance of future performance of the Assigned Contracts as required under Bankruptcy Code Section 365.

# ARTICLE 6
# TERMINATION

6.1    Termination. This Agreement may be terminated at any time prior to the Closing Date:

(a)    By Buyer's and Seller's mutual written consent;

11

(b)   By Buyer if Seller fails to perform, in any material respect, any of its covenants, agreements, or obligations under this Agreement, and any such failure is not cured within 10 business days after written notice from Buyer;

(c)   Automatically, and without further action or notice by either party or Bankruptcy Court approval, if the Bankruptcy Court does not enter the Sale Order by September 15, 2009; or

(d)   By Seller if Buyer breaches any of its representations or warranties in any material respect herein or fails to perform, in any material respect, any of its covenants, agreements, or obligations under this Agreement, and any such breach or failure is not cured within 10 business days after written notice from Seller.

6.2   <u>Effect of Termination</u>. In the event of any termination of this Agreement other than pursuant to <u>Section 6.1(d)</u> above, Seller shall return to Buyer the entire Deposit (with any interest earned thereon) paid by Buyer hereunder in accordance with the Bidding Procedures approved by the Bankruptcy Court by Order entered on August 3, 2009. Buyer's rights and remedies resulting from any breach by Seller of his obligations hereunder shall be preserved notwithstanding termination of this Agreement in accordance with this <u>Article 6</u>.

## ARTICLE 7
## GENERAL

7.1   <u>Assignment</u>. This Agreement and the parties' rights hereunder may not be assigned (except by operation of law) and shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns. Notwithstanding the immediately preceding sentence, Buyer may assign its rights hereunder to one or more of its wholly owned direct or indirect subsidiaries so long as Buyer remains obligated to pay the Purchase Price hereunder and such assignment does not alter the Trustee's ability to assume and assign contracts.

7.2   <u>Signatures</u>. Signatures on this Agreement delivered by fax or electronic mail shall be considered original signatures for purposes of effectiveness of this Agreement.

7.3   <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts which may be delivered by facsimile or electronic mail, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

7.4   <u>Fees and Expenses</u>. Whether or not the transactions herein contemplated shall be consummated, (a) Seller will pay the fees, expenses and disbursements of Seller, and its agents, representatives, accountants and counsel incurred in connection with the

12

subject matter of this Agreement and any amendments thereto, and (b) Buyer will pay the fees, expenses and disbursements of Buyer and its agents, representatives, accountants and counsel incurred in connection with the subject matter of this Agreement and any amendments hereto.

7.5    Counsel. Each party hereto warrants and represents that such party has been afforded the opportunity to be represented by counsel of its choice in connection with the execution of this Agreement and has had ample opportunity to read, review and understand the provisions of this Agreement.

7.6    Notices. Any notice or communication required or permitted hereunder shall be sufficiently given if sent by first class mail, postage prepaid:

      (a)    If to Seller, addressed to Trustee at:

           Warren E. Agin, Esquire, Trustee
           For Chapter 7 Debtor, Innovative Spinal Technologies, Inc.
           c/o Swiggart & Agin, P.C.
           197 Portland Street, Fourth Floor
           Boston, MA 02114
           Fax: (617) 723-2830

      (b)    With a copy to its counsel at:

           Eckert Seamans Cherin & Mellott, LLC
           Two International Place, 16th Floor
           Boston, MA 02110
           Attn: John Loughnane, Esquire
           Fax: (617) 342-6899

46501/0001-5920147v3

(c)     If to Buyer, addressed to it at:

Biomet, Inc.
56 East Bell Drive
P.O. Box 587
Warsaw, Indiana 46581-0581
Attn: General Counsel
Fax: (574) 372-1960

(d)     With a copy to its counsel at:

Ilana Volkov, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.
25 Main Street
Hackensack, New Jersey 07601
Fax: (201) 678-6269
E-mail ivolkov@coleschotz.com

7.7     Opportunity to Investigate. All of the parties have had an opportunity to
investigate and evaluate the Assets being purchased, have relied on independent
professional advice and, therefore, agree that the price to be paid by Buyer for the Assets
is reasonably equivalent value for the Assets.

7.8     Governing Law and Jurisdiction. THIS AGREEMENT (AND ALL
DOCUMENTS, INSTRUMENTS, AND AGREEMENTS EXECUTED AND
DELIVERED PURSUANT TO THE TERMS AND PROVISIONS HEREOF (SUCH
DOCUMENTS, THE "ANCILLARY DOCUMENTS")) SHALL BE GOVERNED BY
AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE
BANKRUPTCY CODE AND TO THE EXTENT NOT INCONSISTENT WITH THE
BANKRUPTCY CODE, THE INTERNAL LAWS OF THE COMMONWEALTH OF
MASSACHUSETTS WITHOUT GIVING EFFECT TO THE PRINCIPLES OF
CONFLICTS OF LAW THEREOF. BUYER AND SELLER FURTHER AGREE
THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION
OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (A) THE
INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY
ANCILLARY DOCUMENT AND THE SALE ORDER AND (B) THE ACQUIRED
ASSETS, ASSIGNED CONTRACTS AND THE ASSUMED LIABILITIES. BUYER
EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH
EXCLUSIVE JURISDICTION; *PROVIDED, HOWEVER,* THAT IF THE
BANKRUPTCY COURT REFUSES TO ACCEPT JURISDICTION OVER ANY SUCH
DISPUTE, THEN ANY STATE OR FEDERAL COURT LOCATED IN THE COUNTY
OF SUFFOLK, COMMONWEALTH OF MASSACHUSETTS, SHALL HAVE

14

JURISDICTION OVER SUCH DISPUTE AND BUYER AND SELLER HEREBY
CONSENT TO THE JURISDICTION OF SUCH COURT IN ANY SUCH CASE.

     7.9    Conflicts. In case any provision in this Agreement shall conflict with any
part of the Sale Order, the terms of the Sale Order shall control and shall be given
precedence by the parties hereto over any such conflicting term in this Agreement

     7.10    Captions. The captions in this Agreement are for convenience only and
shall not be considered a part hereof or affect the construction or interpretation of any
provisions of this Agreement.

     7.11    Entire Agreement. This Agreement and the documents delivered pursuant
hereto constitute the entire agreement and understanding between Seller and Buyer and
supersede any prior agreement and understanding relating to this Agreement's subject
matter. This Agreement may be modified or amended only by a written instrument
executed by Seller and Buyer acting through their duly elected or appointed officers.

     7.12    No Third Party Beneficiary. The terms and conditions of this Agreement
inure solely to the benefit of the parties hereto. No third parties are intended to be
beneficiaries of, or are or shall rely on, any of the terms and conditions of this
Agreement.

     7.13    Buyer Not Successor to Debtor or Trustee. Neither Buyer nor its
designee(s) are or shall be deemed to be successors to Debtor, Seller or the Estate, and
neither Buyer nor its designee(s) shall incur any liability to any party under any theory of
successor liability or similar theory or principle.

     7.14    Limitation on Damages Arising from Buyer's Breach. Seller's sole remedy
in the event that Buyer materially breaches its obligations hereunder shall be the retention
by Seller of Buyer's Deposit in full satisfaction of any claims (including, without
limitation, claims for incidental, consequential or multiple damages) Seller may have
against Buyer resulting from Buyer's breach.

*[Remainder of Page Left Blank; Signatures on Following Page]*

15

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

**SELLER:**

_____

Warren E. Agin, Esquire, as
Chapter 7 Trustee for Debtor,
Innovative Spinal Technologies, Inc.
and not individually

**BUYER:**

Biomet, Inc.

By: _____
Name: Glen Kashuba
Title:   Senior Vice President

16

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

**SELLER:**

_____

Warren E. Agin, Esquire, as
Chapter 7 Trustee for Debtor,
Innovative Spinal Technologies, Inc.
and not individually

**BUYER:**

Biomet, Inc.

By: _____
Name:  Glen Kashuba
Title:   Senior Vice President

## Schedule 1.1

Assets

The Assets shall include (with the exception of any Excluded Assets):

- all assets set forth on Schedule A to the Bidding Procedures approved by the Bankruptcy Court by Order entered on August 3, 2009.

- substantially all of the Inventory identified on Debtor's "Inventory Summary" provided by the Trustee on the Due Diligence CD at Section L, Number 4 of the Due Diligence CD.

Schedule 1.1-1

## Schedule 1.8

### Excluded Assets

The following patent applications, and rights and agreements related thereto (the Tsunami Medtech patents; see IST nos. 09-006-P2, P3 & P4):

    60/705,081 Tissue Vaporization Instrument

    11/462,324 Tissue Vaporization Instrument

    60/720,975 Tissue Evacuation Device

    60/780,924 Tissue Evacuation Device

    60/814,937 Tissue Evacuation Device

The following patent applications, and rights and agreements related thereto (the Hochschuler patents; see IST no. 13-001-P 1):

    60/947,746 Facet Fusion Implant

    12/168,030 Facet Fusion Implant

    PCT/US08/69259 Facet Fusion Implant

Debtor's rights in, to or against insurance policies, other than with respect to product liability claims.

Debtor's claims against officers, directors or other fiduciaries, or other claims under which stockholders of the corporation may have a derivative cause of action.

Causes of action arising pursuant to the so-called "avoidance powers" provisions of the Bankruptcy Code under 11 U.S.C. §§541 – 553.

Debtor's accounts receivable.

Agreement dated as of December 15, 2006, by and between X-spine Systems, Inc. and Innovative Spinal Technologies, Inc.

Development and License Agreement, dated as of November 1, 2004, by and among Roger P. Jackson, M.D., Midwest Spine Foundation, SMS Trust Under Trust Agreement dated August 11, 1995 and Innovative Spinal Technologies, Inc., as amended by that certain First Amendment to Development and License Agreement, dated June 1, 2005.

46501/0001-5920147v3

## Schedule 4.2

### Allocation of Consideration

| Class | Description | Consideration |
|-------|-------------|---------------|
| I | Cash | |
| II | Actively traded personal property | |
| III | Receivables | |
| IV | Inventory | |
| V | Other assets including real and personal property | |
| VI | Intangibles other than goodwill | |
| VII | Goodwill | |

Schedule 4.2-1